# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

| | | |
|---|---|---|
| BANK OF THE OZARKS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 2:11-CV-00129-RWS |
| 400 SOUTH LAND COMPANY, | : | |
| LLC, JOT'EM DOWN LAND | : | |
| COMPANY, LLC, JASPER | : | |
| RESIDENTIAL GROUP, LLC, | : | |
| BETHEL VIEW TALLANT, LLC, | : | |
| BENNETT CAPITAL | : | |
| PARTNERS, LLC, MARLOY, | : | |
| INC., REID & REID | : | |
| INVESTMENTS, INC., | : | |
| GREENLEAF RECYCLING, | : | |
| LLC, DANNY M. BENNETT, and | : | |
| DANNY L. REID, | : | |
| | : | |
| Defendants. | : | |

## **ORDER**

This case comes before the Court on Plaintiff's Motion to Dismiss Certain Counterclaims and to Strike Certain Affirmative Defenses [36]. After reviewing the record, the Court enters the following Order.

## **Background**

This case arises out of the alleged breach of six promissory notes (the

AO 72A
(Rev.8/82)

"Notes") and related guaranty agreements (the "Guaranty Agreements") executed by Defendants in favor of Plaintiff's predecessor-in-interest, Chestatee State Bank ("Chestatee"). Defendants allegedly executed the subject Notes and Guaranty Agreements in favor of Chestatee and failed to make payment under them when due. (See generally First Am. and Consolidated Compl. ("Am. Compl."), Dkt. [33].)

On or about December 17, 2010, subsequent to Defendants' execution of the Notes and Guaranty Agreements, the Georgia Department of Banking and Finance closed Chestatee, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as its receiver. (Id. ¶ 79.) At the same time, FDIC, as receiver for Chestatee ("FDIC-R"), entered into a Purchase and Assumption Agreement (the "Purchase Agreement") with Plaintiff, whereby Plaintiff purchased the loan documents at issue. (Id. ¶ 81.) On or about February 4, 2011, FDIC-R executed a Master Assignment in favor of Plaintiff, evidencing the transfer of the first, second, fourth, fifth, and sixth Notes and related loan documents to Plaintiff. (Id. ¶ 82.) This Master Assignment is recorded in the real property records of Forsyth County, Georgia (the "Forsyth County Assignment"). (Id.) On the same date, FDIC-R executed another Master

2

AO 72A
(Rev.8/82)

Assignment in favor of Plaintiff, evidencing the transfer to Plaintiff of the third Note and related documents, which Master Assignment is recorded in the real property records of Pickens County, Georgia (the "Pickens County Assignment"). (Id. ¶ 83.) Plaintiff alleges that as a result of the Purchase Agreement and Master Assignments, FDIC-R "completely transferred any and all interest it had in the [six Notes] and related Loan Documents involved in this action to [Plaintiff]." (Id. ¶ 84.)

Plaintiff filed the Amended Complaint to recover against Defendants on the Notes and Guaranty Agreements, raising claims against Defendants for breach of contract and unjust enrichment.[1] (Am. Compl., Dkt. [33] ¶¶ 124-73.) Defendants filed their First Amended and Consolidated Answer and Counterclaim ("Am. Answer & Counterclaim"), asserting various affirmative defenses and raising counterclaims against Plaintiff for tortious interference with contract and breach of contract. (See generally Dkt. [34].) Plaintiff now moves to (1) dismiss Defendants' counterclaim for breach of contract as to all Defendants; (2) dismiss Defendants' counterclaim for tortious interference with

---

[1] Plaintiff also seeks to recover attorney's fees and expenses pursuant to O.C.G.A. § 13-1-11. (Am. Compl., Dkt. [33] ¶¶ 174-85.)

3

contract as to certain Defendants; (3) strike all of the affirmative defenses as to certain Defendants; and, finally, (4) strike certain affirmative defenses as to other Defendants. The Court considers these requests below.

## Discussion

**I.   Plaintiff's Motion to Dismiss Certain Counterclaims [36]**

In Plaintiff's Motion to Dismiss Certain Counterclaims ("Motion to Dismiss"), Plaintiff argues that Defendants' counterclaim for breach of contract fails as a matter of law as to each Defendant and therefore is due to be dismissed under Federal Rule of Civil Procedure ("Rule") 12(b)(6). Plaintiff also argues that the counterclaim for tortious interference with contract fails as a matter of law with respect to certain Defendants and therefore must be dismissed as to those Defendants under Rule 12(b)(6). The Court sets out the legal standard governing Plaintiff's motion before considering the merits of Plaintiff's arguments.

A.   <u>Legal Standard</u>

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual

4

allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The court does not need to "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

Utilizing this legal standard, the Court considers Plaintiff's Motion to Dismiss. The Court first considers Plaintiff's motion with respect to the breach

5

AO 72A
(Rev.8/82)

of contract counterclaim before turning to the counterclaim for intentional interference with contract.

### B. Analysis

#### 1. *Breach of Contract*

In their breach of contract counterclaim, Defendants allege that Plaintiff's predecessor-in-interest, Chestatee, breached its agreement with Defendants to permit the infusion of a new equity partner into one or more of the Defendant entities and to then restructure Defendants' loans. (Am. Answer & Counterclaim, Dkt. [34] ¶¶ 9-13.) Specifically, the allegations of the breach of contract counterclaim are as follows:

- On or about August 2010, Defendant sought the infusion of an equity partner into one or more of the Defendant entities. Defendant secured such an equity partner and approached Chestatee requesting approval and refinancing.

- Chestatee approved the infusion of equity and structured the deal for Defendants as follows: The new equity partner would invest $800,000. Of that total, $500,000 would be used to reduce debt structure on Defendants' loans with Chestatee and $300,000 would be set up as an interest reserve to debt service all loans for a one year period.

- *Prior to drafting the loan documentation and as a condition of the deal, Chestatee required Defendants to pay a $36,000 fee to Chestatee. Thereafter, Chestatee refused to execute*

6

> *the revised loan modification documents, refused to allow the new equity partner to join the Defendants and refused to return the $36,000 fee.*
>
> • As a direct and proximate result of Chestatee's actions, Defendants were unable to pay all of the loans as they matured in full, were prevented from adding the new equity partner and unable to obtain any alternative financing ensuring Defendants eventual inability to pay the loans.
>
> • As a direct and proximate result of Chestatee's actions, Defendants have been damaged in an amount to be shown at trial that exceeds $75,000.

(Id. (emphasis added).)

Plaintiff moves to dismiss the counterclaim on grounds that it is based on alleged oral representations, not on a written agreement, and therefore is barred by the doctrine enunciated by the Supreme Court in D'Oench, Duhme & Company v. FDIC, 315 U.S. 447 (1942) (the "D'Oench, Duhme" doctrine) and codified at 12 U.S.C. § 1823(e). (Pl.'s Br. in Supp. of Mot. to Dismiss Certain Counterclaims and to Strike Certain Affirmative Defenses ("Pl.'s Br."), Dkt. [36-1] at 7-14.) In D'Oench, the FDIC brought suit to collect on a promissory note acquired in a purchase and assumption transaction. 315 U.S. at 455-56. The maker of the note asserted as a defense failure of consideration, arguing that the failed bank had orally promised the maker that it would not seek to

7

AO 72A
(Rev.8/82)

collect the debt. Id. at 456. The Supreme Court rejected this defense, holding that "a 'secret agreement' outside the documents contained in the bank's records would not operate as a defense against suit by the FDIC on a note acquired from a failed bank."[2] Resolution Trust Co. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995) (quoting D'Oench, 315 U.S. at 459).

---

[2] This common law doctrine was later codified, as to the FDIC, in 12 U.S.C. § 1823(e), which states:

> No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement–
>
> (A) *is in a writing,*
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e) (emphasis added).

8

The D'Oench, Duhme doctrine applies with equal force to bar affirmative claims against the FDIC predicated on unwritten and unrecorded agreements as it does to bar defenses based on such agreements. As the Eleventh Circuit has explained, under the D'Oench, Duhme doctrine, the FDIC may assert the defense of estoppel "to bar a party's claim based on an alleged agreement which does not appear in the bank's records." Victor Hotel Corp. v. FCA Mortgage Corp., 928 F.2d 1077, 1081 (11th Cir. 1991). The rationale behind the doctrine has been explained as follows: "[B]y preventing a party from suing on an agreement not within the bank's records, a 'secret agreement,' FDIC [can] properly rely on [a] bank's records to regulate and protect the fiscal stability of the institution." Id. (citing D'Oench, 315 U.S. at 457). "Such reliance is particularly important in deciding whether to execute a Purchase and Assumption agreement." Id. at 1082 (citation omitted). Finally, the protections of the D'Oench, Duhme doctrine apply not only to the FDIC but also to its successors-in-interest. First Union Nat'l Bank v. Hall, 123 F.3d 1374, 1379 n.9 (11th Cir. 1997).

In this case, the Court agrees with Plaintiff that Defendants' breach of contract counterclaim is based on an alleged oral agreement and therefore is

9

barred under the D'Oench, Duhme doctrine.  In particular, Defendants allege that Plaintiff's predecessor-in-interest breached an agreement to approve the infusion of a new equity partner into one of the Defendant entities and to, thereafter, restructure Defendants' debts.  (Am. Answer & Counterclaim, Dkt. [34] ¶¶ 10-11.)  Defendants allege, however, that this agreement was never memorialized in a writing: "*Prior to drafting the final loan documentation and as a condition to the deal*, Chestatee required Defendants to pay a $36,000 fee." (Id. ¶ 11 (emphasis added).)  "In reliance on Chestatee's *representation*, Defendants paid the $36,000 fee to Chestatee."  (Id. (emphasis added).) "Thereafter, *Chestatee refused to execute the revised loan modification documents*, refused to allow the new equity partner to join the Defendants and refused to return the $36,000 fee."  (Id. (emphasis added).)  There is no allegation that Chestatee's alleged agreement to permit the infusion of the equity partner and to restructure Defendants' debts was contained in a writing; on the contrary, Defendants refer to this alleged agreement simply as a "representation."  And Defendants specifically allege that the promised loan modification never was drafted or executed.

10

Based on these allegations, it appears to the Court that the agreement forming the basis of Defendants' breach of contract counterclaim never was reduced to writing. Therefore, under the D'Oench, Duhme doctrine, the breach of contract counterclaim fails as a matter of law. Plaintiff's motion to dismiss therefore is **GRANTED** as to the breach of contract counterclaim, which counterclaim correspondingly is **DISMISSED** as to each Defendant.

### 2. *Tortious Interference with Contract*

In addition to the counterclaim for breach of contract, Defendants raise a counterclaim for tortious interference with contract, alleging that Plaintiff's predecessor-in-interest wrongfully disclosed to the public that Defendants' loans were in default, resulting in Defendants' loss of an economic opportunity presented by a third party. (Am. Answer & Counterclaim, Dkt. [34] ¶¶ 3-7.) The specific allegations of this counterclaim are as follows:

- On or about February 2010, Plaintiff, by and through Chestatee, wrongfully released information to the public that Defendants' loans were in default when in fact all Defendants' loans were current.

- This wrongful information was transmitted directly or indirectly by Chestatee to individuals with the Trust for Public Land ("Trust").

11

- The trust had made an offer to Defendants in the amount of $3.8 million for the purchase of real property owned by Defendants and pledged as security to Chestatee. This offer was accepted by Defendants and the parties were only awaiting approval from the Forsyth County Commission.

- Upon learning of the wrongful information, the Trust withdrew its offer . . . .

- As a direct and proximate result of Chestatee's wrongful and tortious interference with Defendants' contract rights, Defendants have been damaged in an amount to be shown at trial that exceeds $75,000.

(Id.)

Plaintiff moves to dismiss this counterclaim as to certain Defendants, arguing that those Defendants waived the right to bring any claim against Plaintiff "pertaining to" the loans at issue and therefore are contractually barred from asserting this counterclaim. (Pl.'s Br., Dkt. [36-1] at 20-21.) Plaintiff points to a waiver provision in the Guaranty Agreements (id. at 21), which states: "The Undersigned waives *any and all* defenses, *claims* and discharges of Borrower, or any other obligor, *pertaining to Indebtedness*, except the defense of discharge by payment in full," (see, e.g., Am. Compl., Ex. 2, Dkt. [33-1] at 7 of 37, ¶ 7 (Guaranty Agreement of Danny L. Reid) (emphasis added)).

12

The Court agrees with Plaintiff that any Defendant that executed the foregoing waiver provision is contractually barred from raising counterclaims against Plaintiff pertaining to the loans at issue. Based on the plain language of the waiver provision, "any and all claims" that "pertain to the Indebtedness" clearly and unambiguously are barred. Defendants' counterclaim for intentional interference with contract "pertains to the indebtedness," as it arises out of Plaintiff's predecessor-in-interests' alleged disclosure to the public that the loans at issue in this case (i.e., the indebtedness) were in default. The counterclaim therefore is barred as a matter of law as to any Defendant that executed the waiver provision. Plaintiff's motion to dismiss the counterclaim for intentional interference with contract therefore is **GRANTED** to the extent it is raised by those Defendants, and the counterclaim correspondingly is **DISMISSED** as to them.

C. Conclusion

In accordance with the foregoing, Defendants' breach of contract counterclaim is **DISMISSED** as to all Defendants. The counterclaim for intentional interference with contract is **DISMISSED** as to each Defendant that executed the waiver provision referenced above.

13

## II. Plaintiff's Motion to Strike Certain Affirmative Defenses [36]

In addition to its Motion to Dismiss, Plaintiff has filed a Motion to Strike Certain Affirmative Defenses raised by Defendants. (Pl.'s Mot. to Dismiss Certain Counterclaims and to Strike Certain Affirmative Defenses ("Pl.'s Mot. to Strike"), Dkt. [36].) Motions to strike are governed by Rule 12(f), which provides in pertinent part that "[t]he court may strike from a pleading an insufficient defense . . . ." Fed. R. Civ. P. 12(f). It is well-settled among courts in this circuit that motions to strike are disfavored and usually will be denied unless it is clear the pleading sought to be stricken is insufficient as a matter of law. Nankivil v. Lockheed Martin Corp., 216 F.R.D. 689, 690 (M.D. Fla. 2003).

The affirmative defenses asserted in Defendants' Amended Answer and Counterclaim are as follows: failure to state a claim upon which relief can be granted (first defense); failure of consideration (second defense); waiver, estoppel, promissory estoppel, payment, and release (third defense); novation and accord and satisfaction (fourth defense); lack of privity (fifth defense); and, finally, lack of diversity jurisdiction (sixth defense). (Am. Answer & Counterclaim, Dkt. [34].) Plaintiff moves to strike these defenses on various

14

grounds. First, Plaintiff moves to strike Defendants' second, third, and fourth affirmative defenses on grounds that they, like Defendants' breach of contract counterclaim, are barred by the D'Oench, Duhme doctrine and 12 U.S.C. § 1823(e). (Pl.'s Br., Dkt. [36-1] at 15-16.) Plaintiff moves to strike the fifth and sixth affirmative defenses on grounds that they are refuted by evidence in the record and therefore fail as a matter of law. (Id. at 16-20.) Finally, Plaintiff moves to strike each of the affirmative defenses as to those Defendants that executed the waiver provision discussed in Part I.B.2, supra. (Id. at 20-22.) The Court considers each of these arguments below.

First, for the reasons stated in Part I.B.2, supra, the Court finds that each of the affirmative defenses is due to be stricken as to those Defendants that executed the waiver provision discussed above, which provision clearly and unambiguously bars "any and all *defenses* . . . pertaining to Indebtedness." Additionally, the Court agrees with Plaintiff that evidence in the record demonstrates privity of contract between the FDIC and Plaintiff with respect to each of the six Notes at issue. (See Am. Compl., Exs. 1, 7, 15, 20, 28, 32 (allonges to each Note evidencing transfer of Note from FDIC to Plaintiff).)

15

Affirmative defense five (lack of privity) therefore fails as a matter of law and is due to be stricken as to each Defendant.

With these two exceptions, however, the Court finds the arguments raised in Plaintiff's Motion to Strike to be premature. In particular, Plaintiff's argument that the D'Oench, Duhme doctrine and 12 U.S.C. § 1823(e) bar affirmative defenses two (failure of consideration), three (waiver, estoppel, promissory estoppel, payment, and release), and four (novation and accord and satisfaction) (as to Defendants that have not waived all defenses) is premature. The Court agrees that any affirmative defense against Plaintiff's attempt to recover on the Notes based on an unwritten agreement will be barred under the D'Oench, Duhme doctrine. See discussion, Part I.B.1, supra (explaining D'Oench, Duhme doctrine). At this stage in the litigation, however, it is not clear to the Court that these affirmative defenses are based on an unwritten agreement and therefore barred.

Similarly, at this stage in the proceeding, the Court cannot rule that the affirmative defense of lack of diversity jurisdiction fails as a matter of law. As Plaintiff argues, for purposes of diversity jurisdiction, a corporation is deemed to be a citizen of every State "by which it has been incorporated" and of the

16

State "where it has its principal place of business . . . ." 28 U.S.C. § 1332(c). Plaintiff alleges in the Amended Complaint that it is a "banking entity created under Arkansas law and having its principal place of business located in Little Rock, Arkansas." (Dkt. [33] ¶ 1.) The parties agree that Defendants are citizens of Georgia. (Pl.'s Br., Dkt. [36-1] at 20; Defs.' Br. in Opp'n to Pl.'s Mot. to Dismiss & Mot. to Strike ("Defs.' Opp'n Br."), Dkt. [37] at 11.)

Defendants correctly argue that because the Amended Complaint is not verified, the allegations in the Amended Complaint concerning Plaintiff's citizenship do not constitute evidence of its citizenship. Plaintiff has directed the Court to evidence in the record that Plaintiff's principal place of business is located at "17901 Chennal Parkway, Little Rock, Arkansas 72223-881." (Pl.'s Reply Br. in Supp. of Mot. to Dismiss & Mot. to Strike ("Pl.'s Reply"), Dkt. [39] at 9 (citing Am. Compl., Exs. 34 & 35 (Master Assignments)).) However, Plaintiff has not directed the Court to evidence in the record regarding the state or states by which Plaintiff has been incorporated. Without this evidence, the Court cannot rule on Plaintiff's citizenship as a matter of law and cannot rule that the affirmative defense of lack of diversity of citizenship (defense six) is insufficient as a matter of law.

17

In sum, Plaintiff's Motion to Strike is **GRANTED** as to each of the affirmative defenses, to the extent they are asserted by Defendants that have executed the waiver provision discussed in Part I.B.2, supra. The motion is also **GRANTED** as to the affirmative defense of lack of privity (affirmative defense five), which defense is refuted by evidence in the record. With these exceptions, the motion is **DENIED**.

## Conclusion

In accordance with the foregoing, Plaintiff's Motion to Dismiss Certain Counterclaims and to Strike Certain Affirmative Defenses [36] is **GRANTED, in part and DENIED, in part**. The Motion to Dismiss is **GRANTED** with respect to Defendants' counterclaim for breach of contract, which counterclaim is hereby DISMISSED as to each Defendant. It is also **GRANTED** with respect to Defendants' counterclaim for tortious interference with contract, to the extent the counterclaim is asserted by Defendants that have executed the waiver discussed in Part I.B.2, supra. The counterclaim for tortious interference with contract therefore is DISMISSED as to those Defendants.

The Motion to Strike is **GRANTED** as to each of the affirmative defenses, to the extent those defenses are asserted by Defendants that have

18

executed the waiver discussed in Part I.B.2, supra. Affirmative defenses one (1) through six (6) therefore are STRICKEN with respect to those Defendants. The Motion to Strike is also **GRANTED** as to affirmative defense five (5) (lack of privity), which affirmative defense therefore is STRICKEN as to each Defendant. The Motion to Strike is **DENIED** as to affirmative defenses two (2), three (3), four (4), and six (6), to the extent these defenses are raised by Defendants that have not executed the waiver discussed in Part I.B.2, supra.[3]

**SO ORDERED**, this   24th   day of August, 2012.

*/s/ Richard W. Story*
**RICHARD W. STORY**
United States District Judge

---

[3] Plaintiff did not move to strike affirmative defense one (1), except insofar as it is asserted by Defendants that waived the right to raise defenses pertaining to the loans at issue. (Pl.'s Br., Dkt. [36-1] at 2, 15-21.)

AO 72A
(Rev.8/82)